## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
VALERIE LINCOLN,              :
                              :
         Plaintiff,           :
                              :
v.                            :    Civ. No. 3:03CV01418(AWT)
                              :
ST. FRANCIS HOSPITAL and      :
MEDICAL CENTER, MARY INGUANTI :
and BRUCE DALSTROM,           :
                              :
         Defendants.          :
                              :
------------------------------x
```

### RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Valerie Lincoln ("Lincoln" or "plaintiff"), brings this action against St. Francis Hospital & Medical Center ("Hospital"), Mary Inguanti ("Inguanti") and Bruce Dalstrom ("Dalstrom").  The Complaint (Doc. No. 1) sets forth five claims for relief.  In the First Claim for Relief,  Lincoln alleges that the defendants discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981 and the Fourteenth Amendment to the United States Constitution by interfering with her right to make and enforce contracts.  In the Second Claim for Relief, Lincoln alleges that the Hospital discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  In the Third Claim for Relief, Lincoln alleges that the Hospital retaliated against her in violation of Title VII.  The Fourth Claim for Relief is a claim against Inguanti for negligent

infliction of emotional distress.  The Fifth Claim for Relief is
a claim against Inguanti for intentional infliction of emotional
distress.  The defendants have moved for summary judgment as to
each claim for relief, and their motion is being granted.

## I.   Factual Background

Lincoln is an African-American woman, who began working at
the Hospital as a secretary on January 24, 1992.  In May 1998,
Lincoln requested and was granted a transfer to the Hospital's
Pharmacy Department where, beginning in June 1998, she was
supervised by Inguanti, the Interim Director of the Pharmacy
Department.  Inguanti became the Director of the Pharmacy
Department in February 1999.  During her tenure as Interim
Director and Director of the Pharmacy Department, Inguanti's
responsibilities increased significantly as the Hospital expanded
its service locations throughout Connecticut, including a new
campus in Portland, Connecticut.  As Inguanti's responsibilities
increased, so did the secretarial responsibilities of her
subordinate, Lincoln.  In the Fall of 2000, Lincoln received a
3.5% pay increase, which was based on Inguanti's positive reviews
of her performance.  Then, in September 2000, Inguanti
recommended Lincoln for a promotion from a Secretary IV position
to a Secretary V position, which was the highest secretarial
classification at the Hospital.  Lincoln was promoted to a
Secretary V position effective October 1, 2000, and her promotion

2

included a commensurate increase in pay.  To help cope with the increasing demands on the Pharmacy Department, the Hospital placed an additional secretary in the Pharmacy Department in September 2000.  Beginning in September 2000, Lincoln and another secretary, who was junior to Lincoln, provided secretarial support to the Pharmacy Department and Inguanti.

As part its evaluation of the new Portland, Connecticut campus, the Hospital required the Pharmacy Department to archive its policies and protocols in electronic files so that Hospital officials could review them.  In the late Spring/early summer of 2001, Inguanti instructed Lincoln to enter and archive the Pharmacy Department's policies and protocols in the Hospital's word processing system.  She did not do so, and Inguanti repeated her request.  Then, on or about July 13, 2001, Inguanti, believing that the task had not been completed, left a voicemail message for Lincoln, in which she stated words to the effect of, "where are the fucking policies."[1]  (Inguanti Aff., at ¶ 19.)

---

[1] The parties dispute whether Lincoln had actually completed the assignment at the time Inguanti left the voicemail message. This dispute, however, is not material to the court's analysis. Also, there is some confusion as to the date that Inguanti left the voicemail message.  In her Memorandum in Opposition to Motion for Summary Judgment (Doc. No. 25) ("Opposition Memorandum"), Lincoln contends that she "received" the voicemail on July 25, 2001.  (See Opposition Memorandum, at 2.)  In contrast, the defendants have described the date that Inguanti left the voicemail as "on or about July 13, 2001," (see Def.'s Loc. R. 56(a)(1) Statement ¶ 17), and, alternatively, "July 12, 2001." (See id. at ¶ 18; Inguanti Aff., at ¶ 19.)  The precise dates that the voicemail was left and received are not material to the

Later that day, when Inguanti returned to the office, Lincoln informed her that she did not appreciate being spoken to or treated in that manner.  Before the end of the work day, Inguanti apologized to Lincoln for leaving the voicemail message.  Prior to receiving Inguanti's voicemail message, Lincoln had no complaints about the way Inguanti treated her.

On the same day that she received the voicemail, Lincoln reported the incident to Marianne Delfino ("Delfino"), a Human Resources Representative, who Lincoln alleges agreed to keep their conversation about the incident confidential.  Lincoln informed Delfino about the voicemail message because she "just wanted someone in human resources to know that  . . . [Inguanti] had talked to me in that manner."  (Lincoln Dep., at 40.) Following her meeting with Lincoln, Delfino contacted Dalstrom, the Systems Vice President of Human Resources.  Delfino informed Dalstrom that (1) Inguanti had left a profane voicemail message for Lincoln and, (2) although Delfino had presented Lincoln with the option of filing a grievance, she had decided not to do so.

On July 25, 2001, Inguanti met with Lincoln to discuss certain deficiencies in Lincoln's job performance, including her failure to arrange for pharmacy students to receive pagers, her

---

court's analysis.  However, because Lincoln describes a series of events that occurred over several days between the date the voicemail was left and the date she received a written anecdotal warning on July 25, 2001, the court concludes that Inguanti left the voicemail on or about July 13, 2001.

failure to notify individuals of a meeting they were expected to attend, and her failure to adequately maintain employee records. In accordance with the Hospital's personnel policies, Inguanti provided Lincoln with a "Written Anecdotal Warning," which included a 30-day performance improvement plan ("performance improvement plan").[2]  Several days after receiving the Written Anecdotal Warning, Lincoln met with Dalstrom because she was not satisfied that Inguanti's apology was a sufficient institutional response to the way she had been treated.  During this meeting, Lincoln informed Dalstrom about the substance of the voicemail message she had received from Inguanti, but, according to Dalstrom, "did not seem to understand that she had performance issues."  (Dalstrom Aff., at ¶ 13.)  Lincoln contends that after hearing her account of the voicemail message Dalstrom stated that had Lincoln used similar language in the workplace she would have been "walked out."  (Opposition Memorandum, at 3.)  Lincoln claims that she replied, "[o]ther than the color of my skin what is the difference between me and Mary." (Id.)  According to Lincoln, Dalstrom did not respond to this comment.  Dalstrom denies that he stated that Lincoln would have been escorted from the building for using language similar to that used by Inguanti, but for purposes of this motion, the court accepts the

---

[2] The performance improvement plan was extended on several occasions, and it eventually expired on October 26, 2001.

plaintiff's version of the meeting.

On August 12, 2001, Lincoln filed a grievance against Inguanti in which she alleged that the Written Anecdotal Warning had been issued in retaliation for Lincoln's complaint to Delfino.  On August 16, 2001, Delfino and Inguanti held a meeting with Lincoln at which they discussed the grievance and the specific aspects of Lincoln's performance that Inguanti found unacceptable.  Lincoln did not pursue her grievance beyond this meeting, although she had the right to do so.

Throughout September and October 2001, Inguanti met with Lincoln on numerous occasions to discuss Lincoln's compliance with the performance improvement plan.  On September 21, 2001, Inguanti communicated to Lincoln that (1) she had not yet updated the electronic personnel files as she had been instructed to do in July and August; (2) she had neglected to enter a meeting in the office calendar; and (3) she continued to have difficulty informing staff members of meeting dates and times.  On October 4, 2001, Inguanti met with Lincoln and indicated that Lincoln had not yet responded to a directive Inguanti initially gave on August 15, 2001.  Specifically, Inguanti had directed Lincoln to identify all of her personal telephone calls on a list of all telephone calls made into and out of the Pharmacy Department for

one month.[3]   Inguanti met with Lincoln again on October 15, 2001
and October 29, 2001, and communicated her continued perception
that Lincoln was failing to adequately maintain the office
calendar and failing to keep staff members informed of meeting
dates and times.  Finally, on October 26, 2001, Lincoln was
suspended for three days without pay.  According to Inguanti and
Lincoln's deposition testimony, the basis for the suspension was
Lincoln's failure to identify her personal telephone calls.

Lincoln contends that following her suspension, Inguanti
placed pressure on her in a variety of ways, including closely
supervising her work and frequently scheduling meetings to review
her performance.  Additionally, at some point after July 13,
2001, Inguanti began to require Lincoln to notify another
employee when she "stepped away from [her] desk," a requirement
which applied to trips to the restroom, lunch breaks and
appointments with the Hospital's employee assistance program.
(Lincoln Dep., at 14-16, 70-71.)  According to Lincoln, she was
the only employee subject to this requirement.  Finally, Lincoln
contends that Inguanti addressed her in a "sarcastic, angry and

---

[3] In her Opposition Memorandum Lincoln disputes that
Inguanti raised the issue of her failure to identify her personal
telephone calls at the October 4, 2001 meeting.  However, in her
deposition testimony Lincoln conceded that on October 4, 2001
Inguanti provided her with a performance improvement plan
progress report which noted her failure to identify her personal
telephone calls.  In addition, Lincoln's handwritten note on the
October 4, 2001 progress report explicitly addresses her failure
to identify the telephone calls.

threatening" tone of voice.  (Opposition Memorandum, at 5.)  In
an effort to get relief from what she perceived as unfair
treatment, Lincoln met with Dalstrom in December 2001.  Dalstrom
informed Lincoln that she should focus on her job performance,
but that if she wished to challenge her suspension or, more
generally, the way she was being treated, she should file a
grievance.  Following this conversation, Lincoln concluded that
the Hospital was not going to intervene to assist her in her
dealings with Inguanti.

By a letter dated January 11, 2002, Lincoln resigned from
her position at the Hospital.  Lincoln testified that she put a
great deal of thought and effort into drafting her resignation
letter so that it communicated "exactly what [she] wanted to
say." (Lincoln Dep., at 202.)  Lincoln's resignation letter
describes what she perceived as the unfair scrutiny she received
and the disrespect with which she was treated.  The resignation
letter makes no mention of a belief that her race played a role
in the way she was treated.  In her resignation letter, Lincoln
informed the Hospital that she was giving the Hospital four weeks
notice and that her last day of work would be February 8, 2002.
However, the Hospital opted to simply pay her through the notice
period rather than having her continue reporting to work.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the

8

court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  Fed.
R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  See Celotex Corp., 477 U.S. at
322.

When ruling on a motion for summary judgment, the court must
respect the province of the jury.  The court, therefore, may not
try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Board of Fire
Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce &
Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is
well-established that "[c]redibility determinations, the weighing
of the evidence, and the drawing of legitimate inferences from
the facts are jury functions, not those of the judge."  Anderson,
477 U.S. at 255.  Thus, the trial court's task is "carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them.  Its duty, in
short, is confined . . . to issue-finding; it does not extend to

9

issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.  As the Court observed in <u>Anderson</u>: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." <u>Id</u>. at 248.  Thus, only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment. <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary

judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence

11

of such issues, a limited burden of production shifts to the
nonmovant, which must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072
(2d Cir. 1993)(quotation marks, citations and emphasis omitted).
Furthermore, "unsupported allegations do not create a material
issue of fact." Weinstock, 224 F.3d at 41.  If the nonmovant
fails to meet this burden, summary judgment should be granted.
The question then becomes whether there is sufficient evidence to
reasonably expect that a jury could return a verdict in favor of
the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

**III. DISCUSSION**

    **A.   The First Claim for Relief**

    In the First Claim for Relief, Lincoln alleges that the
defendants interfered with her right to make and enforce
contracts in violation of 42 U.S.C. § 1981 and the equal
protection clause of the Fourteenth Amendment to the United
States Constitution.

        **1.   Fourteenth Amendment**

    The defendants properly argue that the plaintiff cannot
proceed under the Fourteenth Amendment because she has failed to
allege that any of the defendants are "state actors."  It is
well-established that the Fourteenth Amendment shields citizens

12

from constitutional violations committed by state actors; its prohibitions do not apply to private conduct. See <u>Leeds v. Meltz</u>, 85 F.3d 51, 54 (2d Cir. 1996)(holding that "it is axiomatic" that the Fourteenth Amendment applies only to state actors or private individuals whose actions are fairly attributable to the state). Lincoln has not alleged that any of the defendants are state actors or that they engaged in conduct that is fairly attributable to the state. Therefore, the defendants are entitled to summary judgment with respect to Lincoln's claim for relief under the Fourteenth Amendment.

### 2.   42 U.S.C. § 1981

To establish a claim under 42 U.S.C. § 1981, the plaintiff must allege facts supporting each of the following elements:  (1) the plaintiff is a member of a racial minority; (2) the defendants intended to discriminate against the plaintiff on the basis of her race; and (3) the defendants discriminated concerning one of the statute's enumerated activities. See <u>Brown v. City of Oneonta</u>, 221 F.3d 329, 339 (2d Cir. 2000). One of the activities enumerated in § 1981 is the right to make and enforce contracts. <u>See</u> 42 U.S.C. § 1981(a). A plaintiff may establish that this right was interfered with by demonstrating that a hostile work environment existed or that he or she suffered an adverse employment action, such as a termination or demotion. <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d

13

Cir. 2000).  However, "[i]t is axiomatic that mistreatment at
work, whether through subjection to a hostile environment or
through concrete deprivations as being fired or denied a
promotion is actionable under [the employment discrimination
statutes] only when it occurs because of a[] . . . protected
characteristic."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir.
2001).  See also Gen. Bldg. Contractors Ass'n Inc. v.
Pennsylvania, 458 U.S. 375, 391 (1982)(§ 1981 "can be violated
only by purposeful discrimination.").

     The plaintiff contends that the defendants interfered with
her right to make and enforce contracts on account of her race by
creating a hostile work environment and taking two adverse
employment actions against her.  The court does not reach the
issue of whether such interference occurred because the plaintiff
has failed to produce evidence based upon which a reasonable
juror could conclude that such interference, even if it occurred,
was on account of her race.

     In an effort to demonstrate that a hostile work environment
interfered with her rights under § 1981, Lincoln argues that
"[b]eginning in the last half of the year 2001, Defendant
Inguanti commenced a series of hostile and belligerent verbal and
emotional assaults against the plaintiff due to her race."
(Opposition Memorandum, at 2.)  First, Lincoln contends that
Inguanti created a racially hostile environment by leaving her a

profanely worded voicemail message on July 13, 2001.  However, the content of the voicemail message is racially neutral. Defendant Inguanti did not reference race in any manner, and a conclusion that the harsh tone of the message was a product of racial bias "would be based entirely on speculation, not logic." Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999)(a decisionmaker's vehement and plain spoken opposition to the promotion of a minority professor not suggestive of racial animus).  When Lincoln was asked why she concluded that Inguanti leaving the profanely worded voicemail message was attributable to Lincoln's race, she responded, "[Inguanti] being a white woman and being the director of the pharmacy, people think they can talk down to, you know, African-American people.  And that's the way that message made me feel that she could talk down to me like that."  (Lincoln Dep., at 30.)  These subjective feelings on the part of Lincoln are not sufficient to support a reasonable inference that Inguanti engaged in that conduct because of the plaintiff's race.

Second, Lincoln contends that the issuance of the Written Anecdotal Warning and Inguanti's regular reviews of her compliance with the performance improvement plan were motivated by racial bias.  However, the plaintiff has presented no evidence that would support such an inference; she merely alleges that was the case.  Lincoln testified that other employees were also

unhappy with their performance reviews, and she also testified
that a lot of people complained about Inguanti.  In light of the
fact, emphasized by the plaintiff, that only four or five of the
80 employees in the department were African-American, the
plaintiff's testimony tends to support an inference that Inguanti
did not discriminate on the basis of race.  Moreover, the
defendants properly cite Weeks v. N.Y. State Div. of Parole for
the principle that performance reviews and critiques of employees
are not adverse employment actions, and therefore cannot form the
basis for an inference of discrimination.  273 F.3d 76, 86 (2d
Cir. 2001).

Third, Lincoln now contends that she was singled out for
discriminatory treatment when Inguanti asked her to identify her
personal telephone calls from a list of calls that came into and
went out of the office over a one month period.  The plaintiff's
deposition testimony flatly contradicts this contention.  When
the plaintiff was asked whether she was "told to make a list of
personal phone calls because [she is] black," she responded,
"No."  (Lincoln Dep., at 70.)

Fourth, Lincoln contends that as a result of Inguanti's
racial animus she was required to inform a supervisor or co-
worker each time she went to the restroom, to lunch or to a
meeting with the employee assistance program.  However, facts as
to which there is no genuine dispute do not support the

16

plaintiff's characterization of Inguanti's conduct as
"humiliating" or racially motivated.  (Opposition Memorandum, at
5.)  Lincoln's deposition testimony demonstrates that she was
simply asked to notify someone "when [she] stepped away from
[her] desk."  (Lincoln Dep., at 16.)  Moreover, Lincoln's
testimony reflects that the other secretary in the Pharmacy
Department was subject to the same requirement and that each of
the secretaries had to arrange for coverage during the times when
she was away from her desk.  Lincoln testified that:

> Q:   Who told you that you had to let your supervisor know
>      before you went to lunch?
>
> A:   Alex approached me, and then Victoria and I would work
>      it out amongst ourselves which timeframe we were going
>      to take, whether it was going to be early or late.
>
> Q:   . . . And so Mr. Sibicky told you that you had to let
>      him know when you were going to lunch?
>
> A:   I would have to tell Alex that I was going to lunch,
>      and that Victoria and I needed to make sure someone was
>      there to cover the area, so, yes.

(Lincoln Dep., at 16.)  The fact that Lincoln was required to
inform a supervisor when she stepped away from her desk does not
support an inference of discrimination.  She has not presented
evidence upon which a reasonable juror could conclude that the
impetus for this requirement was racial bias.

Fifth, Lincoln contends that Dalstrom failed to adequately discipline Inguanti and that his failure to do so was a result of Dalstrom's own racial bias against Lincoln.  Lincoln bases this contention on the conversation she states she had with Dalstrom in which Dalstrom indicated to the plaintiff that she would have been fired had she left a profane voicemail message, and then remained silent when the plaintiff suggested that she was subject to a different disciplinary standard because of her race.  The plaintiff characterized Dalstrom's silence as an "obviously racist remark." (Opposition Memorandum, at 16.)  It is not.  In addition, the plaintiff has not presented evidence that would support a conclusion that Dalstrom's failure to take disciplinary action against Inguanti was a product of racial bias.

Sixth, Lincoln contends that Inguanti treated her in a hostile and belligerent manner on account of her race.  This treatment included Inguanti's use of a "sarcastic, angry and threatening" tone of voice and her habit of placing the plaintiff in stressful situations.  (Opposition Memorandum, at 5.)  The plaintiff's deposition testimony demonstrates that a conclusion that the plaintiff suffered this treatment because of her race would be based on conjecture.  Lincoln testified that:

Q:   Can you tell me how you knew that this hostile and belligerent tone was because of your race?

A:   No, I can't answer that, no.

18

(Lincoln Dep., at 25);

> Q:   So other than the fact that Ms. Inguanti's tone was
>
>       hostile and belligerent, and other than the fact of the
>
>       way she talked to you, you can provide no other
>
>       specifics that lead you to conclude that there was a
>
>       series of hostile and belligerent verbal and emotional
>
>       assaults against you due to your race?
>
> A:   Not at this time.

(Id. at 25-26);

> Q:   Is there anything other than the fact that she didn't
>
>       talk to any other person that way that leads you to
>
>       believe the way she talked you was based on your race?
>
> A:    I can't think of anything at the moment?

(Id. at 26.)

Seventh, the plaintiff contends that the Pharmacy Department was a racially hostile work environment because only four or five of the department's 80 employees were African-American.  The plaintiff has presented no evidence of the percentage or number of African-Americans in the Pharmacy Department's applicant pool, which is the relevant data for analyzing a hostile work environment claim.  See Wards Cove Packaging Co., Inc. v. Atonio, 490 U.S. 642, 650-51 (1989).  Moreover, in her deposition testimony, the plaintiff acknowledged that she has no evidence as to whether the Hospital or the human resources department has

engaged in a pattern of discriminatory action, and no information about any other individual who was treated wrongfully because of his or her race.  In fact, that plaintiff testified that she feels she "was discriminated against from human resources by betraying [her] confidence," i.e., revealing that she had reported the incident involving the voicemail message.  (Lincoln Dep., at 115.)

Therefore, Lincoln has failed create genuine issue of material fact with respect to whether the employment conditions described above, which she contends constituted a hostile work environment, were imposed upon her on account of her race.

Lincoln also contends that the defendants interfered with her rights under § 1981 by taking two adverse employment actions, namely suspending her and constructively discharging her on account of her race.  In her Opposition Memorandum, the plaintiff contends that her suspension for refusing to identify the personal telephone calls was discriminatory.  Yet, this contention is refuted by her own deposition testimony.  Lincoln testified that:

> Q:  Were you suspended because you are black?
>
> A:  I don't recall.  I don't recall her telling me that.
>
> Q:  Well, let me ask you a different question.  Whether or not you recall it, were you suspended because you were black?

A:    Probably not.

(Lincoln Dep., at 188-89.)  Thus, the plaintiff has failed to create a genuine issue of material fact as to whether she was suspended because of her race.  She simply has no evidence to support her claim that she was suspended due to her race.

Lincoln also argues that she was compelled to resign because the conditions of her employment had become so difficult and unpleasant as to amount to a constructive discharge.  In support of this contention, the plaintiff directs the court to the same employment conditions that the plaintiff alleges created a hostile work environment, but fails to allege facts that would support her conclusory statements that she was constructively discharged because of her race.  In short, Lincoln "has done little more than cite to [her alleged] mistreatment and asked the court to conclude that it must have been related to [her race]." Grillo v. N.Y. City Trans. Auth., 291 F.3d 231, 235 (2d Cir. 2002).

Accordingly, the defendants' motion for summary judgment should be granted as to the First Claim for Relief set forth in the Complaint.

**B.    Second Claim for Relief**

In the Second Claim for Relief, Lincoln alleges that the Hospital discriminated against her on the basis of her race in violation of Title VII.  In order to survive a motion for summary

21

judgment on a Title VII claim of intentional discrimination, a plaintiff must establish the prima facie elements of a violation. These are (1) that the plaintiff is a member of a protected class; (2) that she was performing her duties satisfactorily; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in the protected class. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). These elements, although sometimes presented in different language, have been held to be the same as those required to state a claim under § 1981. See Choudhury v. Polytechnic Inst. of N.Y., 735 F.2d 38, 44 (1984) ("the same elements constitute a claim for employment discrimination under § 1981 as under Title VII").

The plaintiff concedes that the only alleged adverse employment actions which occurred within the statute of limitations period are the constructive discharge and the defendants' decision to pay her without permitting her to work during the notice period that followed her resignation. For the reasons discussed in Part II.A.2, supra, the plaintiff has failed to produce evidence based upon which a reasonable juror could conclude either that the alleged constructive discharge occurred under circumstances giving rise to an inference of discrimination, or that the Hospital's decision to simply pay her

22

for the notice period rather than have her continue working was based on her race.

Accordingly, the defendants' motion for summary judgment should be granted as to the Second Claim for Relief set forth in the Complaint.

### C.    Third Claim for Relief

In the Third Claim for Relief, Lincoln alleges that the Hospital retaliated against her in violation of Title VII.  To make out a <u>prima facie</u> case of discriminatory retaliation, the plaintiff must provide a sufficient evidentiary basis for a jury to reasonably conclude that: (1) the plaintiff engaged in protected activity; (2) the Hospital was aware of the plaintiff's participation in the protected activity; (3) the employer took an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. <u>See</u> <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996).

The plaintiff contends that she engaged in protected activity by filing a grievance on August 12, 2001.  "To establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." <u>Sumner v. United States Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990).  "While there are no magic

words that must be used when complaining about a supervisor, in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring." Neishlos v. City of N.Y., No. 00CV914, 2003 WL 22480043, at *8 (S.D.N.Y. Nov. 3, 2003) (quoting Ramos v. City of N.Y., No. 96CV3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997)).

The plaintiff's grievance does not constitute protected activity because it failed to provide any notice to the Hospital that she believed she was being discriminated against based on her race.  The grievance makes no mention of race or discrimination.  Rather, the plaintiff stated in her grievance that:

> It is my strong belief that the discrepancies described in the [Written Anecdotal Warning] were a 'direct' result of retaliation on Mary's part for my having stood up for my human rights.  I have always given her the greatest respect and I expect nothing less.  Although Mary apologized later that day, I feel that she does no want me to continue working for her.

(Def.'s Ex. 11, at 1.)  In addition to the fact that the grievance simply fails to notify the Hospital of any belief on the part of Lincoln that she was a victim of discrimination, the plaintiff conceded during her deposition testimony that she never informed anyone at the Hospital of her belief that she was being discriminated against based on her race.  She testified as follows:

24

Q:   Did you believe that you were subjected to this
     behavior because of your race?

A:   I really can't say.

Q:   Did you tell anyone at the hospital that you were
     subjected to this behavior because of your race?

A:   No.

Q:   And it's fair to say that when you tried to give your
     point of view on August 12, 2001, you did not tell
     anyone at the hospital that you believed race was a
     factor, correct?

A:   Correct.

(Lincoln Dep., at 163-64.)  The plaintiff, therefore, cannot
establish that her filing of the grievance constituted protected
activity because the grievance did not communicate to the
Hospital Lincoln's alleged belief that she was being
discriminated against based on her race.

Accordingly, the defendants' motion for summary judgment
should be granted as to the Third Claim for Relief set forth in
the Complaint.

**D.   Fourth Claim for Relief**

In the Fourth Claim for Relief, the plaintiff alleges that
Inguanti negligently caused her to suffer emotional distress by
constructively discharging her.  The Connecticut Supreme Court
has recognized a cause of action for negligent infliction of

emotional distress in the employment context, but it has stated that a claim for negligent infliction of emotional distress in the employment context arises only where "the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." Perodeau v. City of Hartford, 259 Conn. 729, 751 (2002). Because the inquiry focuses on the manner in which the termination was carried out, "[t]he mere termination of employment, even where it is wrongful, is . . . not, by itself, enough to sustain a claim for negligent infliction of emotional distress." Parsons v. United Tech. Corp., Sikorsky Aircraft Div., 243 Conn. 66, 88 (1997). Conduct which gives rise to liability during the termination process is limited to that which is "sufficiently wrongful," i.e., "particularly egregious." Perodeau, 259 Conn. at 751, 755 (2002). "Mere inconsiderate or precipitous conduct may not suffice." Armstead v. Stop & Shop Companies, Inc., 3:01cv1489, 2003 WL 1343245, at *6 (D. Conn. March 17, 2003).

The plaintiff contends that her resignation was the consequence of a constructive discharge, which commenced when she filed her grievance on August 12, 2001 and continued through January 14, 2002, the date the defendants informed her that they

would simply pay her rather than have her work through the notice
period.  In attempting to demonstrate that the alleged
termination was sufficiently wrongful, the plaintiff relies
heavily on her contention that the alleged termination itself was
discriminatory.  Under Connecticut law, however, the wrongful
motivation of an employer is not relevant to the question of
whether the manner in which the termination was carried out was
unreasonable.  See Parsons, 243 Conn. at 88.

Moreover, to the extent the plaintiff argues that Inguanti's
conduct, rather than her motive, was sufficiently wrongful, she
has failed to produce evidentiary support for that contention.
Assuming arguendo that the termination process occurred between
August 12, 2001 and January 14, 2002, in view of facts as to
which there is no genuine issue, no reasonable jury could
conclude  that Inguanti's conduct was sufficiently wrongful that
she should have realized that her conduct involved an
unreasonable risk of causing the plaintiff emotional distress,
which, if caused, might result in illness or bodily harm.

Following the filing of the grievance, Inguanti and Delfino
met with Lincoln to discuss both the plaintiff's grievance and
the areas in which the plaintiff needed to improve her
performance.  Lincoln does not contend that Inguanti acted in a
particularly egregious manner toward her during this meeting.  On
August 16, 2001, Inguanti sent a memorandum to Lincoln outlining
her view of the plaintiff's performance and re-stating the

reasons for the July 25, 2001 issuance of the Written Anecdotal Warning.  On the same day, Inguanti sent a progress report to Lincoln in which she evaluated the plaintiff's compliance with the performance improvement plan.  Between August 16, 2001 and October 31, 2001, Inguanti sent the plaintiff six such progress reports, dated August 16, 2001, September 21, 2001, October 4, 2001, October 15, 2001, October 29, 2001, and October 31, 2001, respectively.  There is nothing in these progress reports that could support a conclusion by a reasonable juror that Inguanti engaged in sufficiently wrongful conduct that she should have realized that her conduct involved an unreasonable risk of causing the plaintiff emotional distress that might result in illness or bodily harm.  (See Def.'s Exs. 12-17.)  Inguanti acknowledges that she met with Lincoln to discuss each progress report, but Lincoln fails to describe with any specificity their interaction during these meetings other than to say that they were "intense."  (Opposition Memorandum, at 17.)

The plaintiff also contends that her suspension was part the overall constructive discharge.  The court finds nothing in the manner in which the plaintiff was suspended that suggests that Inguanti engaged in conduct that was sufficiently wrongful that she should have realized that her conduct involved an unreasonable risk of causing the plaintiff emotional distress that might result in illness or bodily harm.  Rather, Inguanti met with the plaintiff on October 26, 2001, and informed her that

she was being suspended for three days without pay for her
repeated refusal to identify personal calls she had made and
received in the office.  Inguanti originally made this request on
August 15, 2001 and then again on October 4, 2001.  On the
progress report dated October 4, 2001, the plaintiff wrote, "I
decided not to highlight calls that were personal
(incoming/outgoing) because I do not believe it has any
reflection on my ability to do my job."  (Def.'s Ex. 14.)  Having
waited nearly two and a half months for Lincoln to comply with
her request, Inguanti suspended Lincoln for insubordination.  The
plaintiff has not presented any facts about the suspension or the
manner in which she was informed of the suspension based upon
which a reasonable juror could conclude that it was carried out
in a manner that was sufficiently wrongful that Inguanti should
have realized that her conduct involved an unreasonable risk of
causing the plaintiff emotional distress that might result in
illness or bodily harm.

Additionally, the plaintiff contends that by requiring her
to notify a supervisor or co-worker when she stepped away from
her desk, Inguanti negligently inflicted emotional distress upon
her.  As discussed above, the plaintiff's deposition testimony
demonstrates that this requirement was designed and imposed to
assure that another employee was available to cover for the
plaintiff when she stepped away from her desk.  No reasonable
juror could conclude that Inguanti's conduct in this respect was

particularly egregious.

Finally, throughout her Opposition Memorandum the plaintiff describes Inguanti's general attitude toward her as "hostile," "humiliating," "disdainful," etc., but she fails to provide evidentiary support for these characterizations of Inguanti's behavior.  No reasonable juror could conclude, based on the plaintiff's conclusory statements about Inguanti's behavior, that Inguanti's conduct was particularly egregious.  See Armstead, 2003 WL 1343245, at *6 ("conclusory characterizations" such as "demeaning, derogatory and inhumane" are not sufficient basis for liability on negligent infliction of emotional distress claim).

Therefore, after considering the plaintiff's contention that her resignation was the result of a constructive discharge in light of the events between August 12, 2001 and January 14, 2002, no reasonable juror could conclude that Inguanti engaged in conduct during the alleged constructive discharge that was sufficiently wrongful that she should have realized that her conduct involved an unreasonable risk of causing the plaintiff emotional distress and that that distress, if it were caused, might result in illness or bodily harm.

Accordingly, the defendants' motion for summary judgment should be granted as to the Fourth Claim for Relief set forth in the Complaint.

**E.  Fifth Claim for Relief**

In the Fifth Claim for Relief, Lincoln alleges that Inguanti intentionally caused her to suffer emotional distress by constructively discharging her.  A claim for intentional infliction of emotional distress must set forth the following elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme or outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." <u>Petyan v. Ellis</u>, 200 Conn. 243, 253 (1986).  Extreme and outrageous conduct is conduct "exceeding all bounds usually tolerated by a decent society." <u>Id.</u> at 254, n.5. <u>See also</u>, Restatement (Second) of Torts § 46, commented (1965) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community").  Under Connecticut law, the court makes the initial determination of whether the defendant's alleged conduct rises to the level of extreme and outrageous. <u>Dobrich v. Gen. Dynamics Corp.</u>, 40 F. Supp. 2d 90, 104-05 (D. Conn. 1999).

Applying these principles, Lincoln has presented no set of

31

facts upon which a reasonable jury could conclude that Inguanti engaged in extreme and outrageous conduct such that Lincoln would be entitled to relief for intentional infliction of emotional distress.  As discussed in detail above, Lincoln contends only that Inguanti repeatedly met with her to evaluate her performance, suspended her for insubordination, insisted that she notify a supervisor or co-worker when she stepped away from her desk, and generally treated her in a hostile manner.  This conduct simply does not rise to the level of exceeding all bounds usually tolerated by a decent society.

Accordingly, the defendants' Motion for Summary Judgment should be granted as to the Fifth Claim for Relief set forth in the Complaint.

## IV.  CONCLUSION

Accordingly, the defendants' Motion for Summary Judgment (Doc. No. 15) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 24th day of August 2006 at Hartford, Connecticut.

/s/  (AWT)

Alvin W. Thompson
United States District Judge